## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF GEORGIA

In re:

THE ALIERA COMPANIES, INC.
d/b/a Aliera Healthcare, Inc., *et al.*,[1]

                      Debtors.

---

ALIERA LT, LLC, AS LIQUIDATING
TRUSTEE FOR THE ALIERA
COMPANIES, INC. D/B/A ALIERA
HEALTHCARE INC., ET AL., and NEIL F.
LURIA, IN HIS CAPACITY AS THE
TRUSTEE OF THE SHARITY
MINISTRIES, INC., LIQUIDATING
TRUST,

                      Plaintiffs,

v.

BMO HARRIS BANK, N.A.,

                      Defendant.

**Case No. 21-11548 (TMH)**
Currently pending in the U.S. Bankruptcy
Court for the District of Delaware

**Adversary Proceeding No**. 23-_____

## COMPLAINT

---

[1] The jointly administered Debtors in these Chapter 11 cases along with the last four digits of their federal tax identification number include: The Aliera Companies Inc. (9555) (Case No. 21-11548), Advevo LLC (6736) (Case No. 22-10124), Ensurian Agency LLC (3244) (Case No. 22-10123), Tactic Edge Solutions LLC (2923) (Case No. 22-10122), and USA Benefits & Administrators LLC (5803) (Case No. 22-10121).

Plaintiffs, Aliera LT, LLC, as Liquidating Trustee (the "Aliera Trustee") for The Aliera Companies, Inc., et al. (the "Debtors") and Neil F. Luria, in his capacity as the Trustee of the Sharity Ministries, Inc. Liquidating Trust (the "Sharity Trustee"), and collectively with the Aliera Trustee, the "Plaintiffs"), set forth their complaint against Defendant BMO Harris Bank, N.A. ("BMO" or "Defendant"), and allege as follows:

## INTRODUCTION

1.      This is an action to remedy Defendant's participation in a massive scheme perpetrated under the guise of health care sharing ministry ("HCSM") products, which are offered under exceptions to the Affordable Care Act (the "ACA") and state insurance law. The Defendant played a critical role in the scheme whereby tens of thousands of individuals and families were sold hundreds of millions of dollars' worth of these health insurance-like products that were fraudulent in nature. Through this litigation, Plaintiffs seek damages against Defendant for its involvement in this fraudulent scheme in order to compensate for damages suffered by the members (the "Members") of Sharity Ministries, Inc. f/k/a Trinity Healthshare Inc. ("Sharity," "Trinity," or "Trinity/Sharity") and of Unity Healthshare, LLC ("Unity"), an entity that was involved in selling the products during the first phase of the scheme, and the value of goods and services provided by the Debtors' arm's length creditors.

2.      The Debtors were established by Timothy Moses ("Moses")—who had previously been sentenced to over six years in prison after convictions for securities fraud and perjury—as well as his spouse Shelley Steele ("Steele"), and their son Chase Moses ("Chase") (collectively the "Aliera Insiders" or the "Insiders") at the expense of the Debtors' arm's length creditors and the Members. Sharity was an entity effectively controlled by Moses, Steele, and Chase which

purported to be an HCSM. The Aliera Insiders caused the Members' payments to be transferred to the Debtors and they then transferred certain of those funds to the Defendant, rendering Sharity insolvent and unable to pay the Members' medical expenses and resulting in the Debtors' arm's length creditors not receiving payment on their claims.

3.      As part of this scheme, the Debtors relied on Defendant for banking services that were essential to the scheme and its continuation over a period of years. The accounts provided by Defendant received funds that originated as "contributions" or premium payments from Members and the Members were led to believe that a substantial proportion of these payments would be set aside as reserves to pay the benefits promised to the Members. Instead, the overwhelming majority of these funds were used to support the Aliera Insiders' lavish lifestyles and to pay exorbitant administrative costs, including unreasonably high commission payments to insurance brokers who sold the fraudulent products to the Members.

4.      As a result of this scheme, Sharity has been enjoined from conducting business by regulators in at least nine states, became insolvent, and sought Chapter 11 protection. The Aliera Companies, Inc. ("Aliera") has also been enjoined from conducting business in at least six states, became insolvent prior to its Chapter 11 filing, and collapsed into bankruptcy in December 2021 after various state regulators and consumer plaintiffs filed litigation against it alleging fraud claims relating to the illegal insurance business.

5.      From approximately February 2020 to August 2020, the Defendant provided banking services that were essential to the ability of the Aliera Insiders to run their nationwide fraudulent scheme, which caused many hundreds of millions of dollars in harm to the Members and left both Sharity and Aliera insolvent and unable to pay the Members and arm's length

creditors. The Aliera Insiders perpetrated a fraud on the Members by (1) misrepresenting the nature

and accuracy of the HCSM plans; (2) misrepresenting to the Members that they were covered by

a valid policy that would be able to cover their claims and medical expenses; and (3) paying

insurance brokers and agents accepting fees and commissions well in excess of both industry

norms and even often exceeding the true value of the HCSM plans. The Plaintiffs bring this

adversary proceeding to seek recovery for damages caused by Defendant's misconduct and return

of fees paid to by Aliera, Sharity, and/or Unity to the Defendant.

## PARTIES, JURISDICTION, AND VENUE

6.      This proceeding relates to the jointly administered Chapter 11 cases of *In re The
Aliera Companies, Inc., et al.*, No. 21-11548-TMH (the "Bankruptcy Cases") pending in the

United States Bankruptcy Court for the District of Delaware (the "Delaware Court"). On February

16, 2022, the Order for Relief was entered against Aliera, providing for joint administration.

Bankruptcy Cases, ECF No. 75.

7.      The Aliera Trustee was appointed pursuant to an order entered by the Delaware

Court, Bankruptcy Cases, ECF No. 576 (the "Confirmation Order"), confirming the *Modified First
Amended Plan of Liquidation*, attached as Exhibit A to the Confirmation Order (together with all

exhibits thereto, and as may be amended, modified, or supplemented, the "Plan"). Pursuant to the

Plan, the Aliera Trustee has standing to bring claims on behalf of the Aliera bankruptcy estates as

well as the Aliera creditors pursuant to 11 U.S.C. § 544.

8.      The Sharity Trustee was appointed pursuant to the *Findings of Fact, Conclusions
of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming
the Plan of Liquidation of Sharity Ministries, Inc. Pursuant to Chapter 11 of the Bankruptcy Code*

in Sharity's bankruptcy case. *In re Sharity Ministries, Inc.*, No. 21-11001-TMH (Bankr. D. Del.), ECF. No. 343. Pursuant to the Sharity Chapter 11 plan, the Sharity Trustee has standing to bring claims on behalf of the Sharity bankruptcy estate as well as the Sharity creditors pursuant to 11 U.S.C. § 544.

9.      Defendant BMO Harris, N.A. is a national association with its principal place of business in Chicago, Illinois. For jurisdictional purposes, it is a citizen of Illinois because its articles of association list its main office in Illinois.

10.     From approximately February 2020 to August 2020, BMO partnered with Aliera and/or Trinity/Sharity, providing bank accounts and other services that were essential resources for the fraudulent scheme orchestrated by the Aliera Insiders.

11.     This Court has jurisdiction to hear this matter pursuant to, without limitation, 28 U.S.C. §§ 157, 1331, and 1334, as the claims asserted herein arise in or relate to the bankruptcy cases of Aliera and Sharity. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

12.     The Court has subject-matter jurisdiction and personal jurisdiction over all the parties. As a result of the Defendant's minimum contacts with the forum, the Defendant is subject to the personal jurisdiction of the Court.

13.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1409(c). Pursuant to the Plan, the Aliera Trustee has standing to bring claims on behalf of Aliera's creditors under, without limitation, section 544(b) of the Bankruptcy Code. Likewise, the Sharity Trustee has standing to bring claims on behalf of Sharity's creditors under, without limitation, section 544(b) of the Bankruptcy Code.

- 5 -

14. The statutory bases for the relief requested herein are 11 U.S.C. §§ 105(a) and 544 and Federal Rules of Bankruptcy Procedure 7001 and 7018, as well as other applicable statutes and state laws.

15. Plaintiffs reserve their rights to a jury trial with respect to all matters so triable.

## BACKGROUND

### I. Introduction and Overview

16. Aliera was incorporated in Delaware by the Insiders, Moses, Steele, and Chase, in December 2015.

17. Before forming Aliera, Moses was the president and CEO of International BioChemical Industries, Inc., a company that declared bankruptcy in 2004 after he was charged with felony securities fraud and perjury relating to a "pump and dump" scheme based on fraudulent statements. As a result of the criminal case, *United States v. Moses*, No. 1:04-cr-00508-CAP-JMF (N.D. Ga.), Moses was sentenced to 78 months in prison (reflecting an upward departure from the sentencing Guidelines) and ordered to pay $1.65 million in restitution.[2] The Eleventh Circuit affirmed Moses's convictions and sentence. *United States v. Moses*, 219 F. App'x 847 (11th Cir. 2007). The district court revoked Moses's supervised release in May 2014 after Moses failed to disclose financial information and opened new lines of credit without his probation officer's approval. *Moses*, No. 1:04-cr-00508, ECF Nos. 145, 150.

18. Just months after ultimately completing his sentence in April 2015, Moses formed Aliera. Aliera was a for-profit entity. Its stated scope of business was "to engage in the business of providing all models of Health Care to the general public" and "to cultivate, generate or

---

[2] Steele caused Aliera to make the restitution payment on Moses's behalf.

otherwise engage in the development of ideas or other businesses. To buy, own or acquire other businesses, to market and in any way improve the commercial application to the betterment and pecuniary gain of the corporation and its stockholders." Notably, Aliera's formation documents do not include any discussion of religious or ethical purposes or missions. The Debtors were formed to provide services to HCSMs, including Sharity. After disputes with other HCSMs, Sharity became the primary client and mechanism for the Insiders and the Defendant to extract cash from the Members.

19.     The Debtors began selling their health care products in late 2015, just months after the termination of Moses's supervised release from his felony convictions. At the time it was formed, Aliera only sold "direct primary care medical home" ("DPCMH") plans. DPCMH plans generally cover limited services such as some doctors' visits and basic lab services. These plans provide no hospitalization or emergency room coverage and are not ACA-compliant.

20.     The Insiders realized Aliera could greatly increase the sales of its health care products if it could take advantage of the federal statute that exempted taxpayers who purchased HCSM coverage from the ACA's individual mandate. And they realized that Aliera could evade insurance laws in many states that also have an exemption from insurance regulations for entities that meet those states' HCSM requirements.

21.     Anabaptist Healthshare ("Anabaptist") is a small Mennonite entity located in Virginia. Anabaptist is recognized by the federal Department of Health & Human Services's Centers for Medicare & Medicaid Services as an HCSM under 26 U.S.C. § 5000A.[3]

---

[3] When Congress passed the ACA in 2010, it required all individuals to be covered by health insurance or pay a penalty. Congress allowed for a handful of exceptions to that requirement, set out in 26 U.S.C. § 5000A. One of those

22.    In 2016, Moses convinced Anabaptist to permit Aliera to market its DPCMH plan "side by side" with Anabaptist's sharing program in order to leverage Anabaptist's HCSM designation. Anabaptist created a wholly owned subsidiary, Unity, for that purpose. On February 1, 2017, Aliera entered into a final contract with Unity that superseded a series of earlier agreements. Under that contract, Aliera would offer to the public its own health care products that did not meet the insurance benefits and coverage requirements under the ACA and that did not independently qualify for the HCSM exemption under 26 U.S.C. § 5000A. In return, Aliera's customers would join the Unity HCSM, increasing the membership in Anabaptist's HCSM. Under the contract with Unity, Aliera was responsible for maintaining and segregating the assets received that were supposed to be reserved for payment of benefits to Unity members.

23.    Although Aliera, directly and through insurance brokers, marketed the plans to consumers throughout the country as HCSM plans through Unity, Aliera's own DPCMH plans were marketed as well. Members made payments for both components of the plan directly to Aliera, and Aliera unilaterally determined how much of the payment was designated for the Aliera

---

exceptions was for members of existing HCSMs. In order to qualify as an HCSM under the ACA, an entity must meet the following rigid requirements:

> (1) it must be recognized as a 501(c)(3) tax-exempt organization;
> (2) its members must "share a common set of ethical or religious beliefs and share medical expenses among members according to those beliefs";
> (3) its members must "retain membership even after they develop a medical condition";
> (4) it must have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999"; and
> (5) it must be subject to an annual audit by an independent CPA and make that audit available to the public upon request.

*Id.* (d)(2)(B)(ii). The reasons for the 1999 cutoff date were to ensure the reliability of care that comes with historical practice and to prevent "opening the flood gate" to groups seeking to circumvent the ACA's requirements. *Liberty Univ. v. Lew*, 733 F.3d 72, 102 (4th Cir. 2013).

component, what portion was designated for the Unity component, and how much of the payment would be used to actually pay Members' medical expenses.

24.     In 2018, after thousands of Aliera/Unity plans had been sold nationwide, Anabaptist/Unity discovered that Moses had written himself approximately $150,000 worth of checks from a Wells Fargo bank account containing Unity funds without board approval and had not properly maintained assets reserved for payment of benefits to Members. It requested an accounting and, in July 2018, demanded that Aliera turn over control of all Unity funds.

25.     Unity terminated the relationship with Aliera in the summer of 2018. A lawsuit between Aliera and Anabaptist Health Share/Unity was filed in the Superior Court of Fulton County, Georgia in late 2018 styled *Aliera Healthcare v. Anabaptist Health Share, et al.,* No. 2018-cv-308981 (Hon. Alice D. Bonner, Ga. Sup. Ct.) (the "Georgia Lawsuit"). The court found that administrative fees paid to Aliera under its agreement with Unity amounted to millions of dollars. Indeed, an Aliera employee testified in the Georgia Lawsuit that Aliera generated more than $180,000,000 in revenue in 2018 alone.

26.     With its relationship with Unity terminating, Aliera would have no affiliation with any HCSM through which to sell its health care plans. Aliera and its principals therefore created Trinity Healthshare, Inc. ("Trinity") on June 27, 2018, as a purported Delaware nonprofit entity.

27.     William Rip Thead, III ("Thead") became the CEO of Trinity. Mr. Thead was an Aliera employee at the time it created Trinity.

28.     Aliera's law firm filed an application with the IRS for recognition of Trinity as a 501(c)(3) charitable organization and was authorized to exercise power of attorney on behalf of Trinity in connection with that application. The application, which Thead signed as Trinity's

chairman, failed to disclose the anticipated financial arrangement with Aliera, the law firm's employer.

29.     On or about August 13, 2018, Aliera signed an agreement with Trinity to provide the marketing, sale, and administration of the purported HCSM plans they created (the "2018 Agreement"). The 2018 Agreement was drafted by Aliera and its agents and was not an arm's length transaction. Chase signed the 2018 Agreement on behalf of Aliera and Thead signed it on behalf of Trinity.

30.     The 2018 Agreement allowed Aliera to use Trinity's nonprofit status to sell health care plans purporting to be HCSM plans, and to maintain complete control over design of the plans, the money collected, the administration of the plans, the benefits paid, and the membership roster. Under the 2018 Agreement, Trinity delegated to Aliera authority to provide accounting staff, financial and membership reporting, and audit and tax-filing support. It gave Aliera control over enrolling new members. It also gave Aliera the "exclusive ownership rights to the Membership Roster," and provided that Trinity was "not authorized to contact any members or use any information contained in the Membership Roster for any purpose without the prior written consent of Aliera." Aliera was granted authority in its sole discretion to "substitute any component of a Plan." In other words, Trinity was just a front for Aliera.

31.     The payment scheme under the 2018 Agreement was especially prejudicial to the Members. The Agreement provided that ***all Member "contribution" payments were to be made directly to Aliera***, which then allocated 30 to 40% (depending on the plan) of every payment to sales commissions, and also provided that Aliera would be paid substantial additional administrative fees. Only a small fraction of the amount of a member contribution (about 16% of

the amount paid under most of the plans) was actually to be placed into a Trinity Sharebox account (the "Sharebox") for the payment of claims.

32.     By contrast, under the ACA, health insurers in the small-group or individual markets may not spend more than 20% of premium payments on administrative and other non-claims-related costs, and 80% must be spent on benefits. 42 U.S.C. § 300gg-18(b)(1)(A).

33.     Due to the small percentage of the Members' payments eventually ending up in the Sharebox for payment of claims, there were insufficient funds to pay Members' claims. Aliera hid this deficiency by avoiding, delaying, or unreasonably denying payment of claims. When Members complained, Aliera's practice was, *inter alia*, to make false promises of payment, demand that medical providers resubmit medical records multiple times, or advise that it would "reprocess" the requests for payment. Aliera never advised the Members, however, that there were insufficient funds to pay the claims because Aliera was siphoning off as much as 84% of the Members' monthly contributions for "administrative" costs.

## II.     Aliera Designs, Markets, and Sells Health Care Plans that Function as Health Insurance and Draws Scrutiny from State Regulators.

34.     Aliera designed and created the Trinity health care plans to be sold to Members as "alternatives" to health insurance that mimicked traditional health insurance plans. For example:

   a.     It created "sell sheets" that laid out benefits and costs for various plans. The more robust the plan and the lower the deductible (called a "Member Shared Responsibility Amount" or "MSRA"), the more a member paid. Similarly, the cost of the plans increased as a Member aged and if the member smoked.

   b.     It advertised the plans as "great for those who simply want to have peace of mind knowing that they will be able to receive the health care services they need when they need them," or as "allow[ing] members to achieve comparable cost assurances for catastrophic health care services (including preventative care and immediate access to doctors through office visits, urgent care, and telemedicine) at a much lower cost."

c.  It identified healthcare expenses, such as inpatient and outpatient care, prescription benefits, preventive care, specialty care, and hospitalization, which would be included after the MSRA or a copay was paid.

d.  It misrepresented that payments to Aliera and its claims practices were similar to those used in health insurance by offering a standard "comparison" of the terms used by Aliera to those used in standard insurance policy. Hence, a premium was a "contribution," a deductible was a "Member Shared Responsibility Amount (MSRA)," and a co-pay was a "co-expense."

e.  Aliera called certain plans "Gold," "Silver," or "Bronze" plans, just as ACA-compliant health insurance plans are often called.

f.  It created benefits booklets that outlined the benefits of the plan, the exclusion from coverage (described as "limits of sharing"), and the necessity of preauthorization for certain medical expenses.

g.  The monthly premium payments that Aliera described as "voluntary contributions" were, in fact, mandatory if a member wanted to be eligible for coverage of health care costs, just like insurance premiums.

h.  The plans were sold by licensed insurance agents who were offered outsized commissions for selling the Aliera/Trinity plans.

i.  Like an insurance company, Aliera made payments for covered eligible medical expenses directly to medical providers after receiving standard health insurance claims. Members never sent payments directly to one another.

j.  The plans promised coverage for an expansive network of "in network" providers, and Aliera represented that it was affiliated with "a growing nationwide PPO network of more than 1,000,000 health care professionals and more than 6,000 facilities."

35.   Members received a card that mimicked a health insurance card and were advised to keep it with them at all times to present to health care providers.

36.   Aliera marketed and represented these health care plans as HCSM plans even though, as Aliera knew, Trinity could not qualify as a legitimate HCSM under 26 U.S.C. § 5000A(d)(2)(B)(IV) for the following reasons:

a.  Trinity was created 15 years after December 31, 1999, and, at the time of its creation in 2018, had no members. Under the federal statute, an entity or a predecessor of the entity must have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999." 26 U.S.C. § 5000A(d)(2)(B)(IV). Trinity did not have members who had shared medical expenses "continuously and without interruption since at least December 31, 1999." Nor did Trinity have any predecessor entity. The application form submitted to the IRS by Aliera's attorney checked "No" to the question, "[a]re you a successor to another organization?"

b.  In addition, in order to qualify as an HCSM under federal law, the members of the entity must "share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs." *Id.* (d)(2)(B)(III). Although Trinity's original bylaws, attached to its application to the IRS for recognition as a 501(c)(3) entity, set forth a specific set of Protestant Christian religious beliefs, Trinity never restricted its membership to those individuals who affirmed specific common beliefs. Members were only asked to affirm a generic "Statement of Beliefs" that refers to no particular religion. As stated in "frequently asked questions" on Trinity's website, "Trinity HealthShare welcomes members of all faiths who can honor the Statement of Beliefs, by which the Trinity HealthShare program operates." As a practical matter, the generic Statement of Beliefs allowed sale of the health care products to the general public.

c.  Although a CPA firm prepared an independent auditor's report of Trinity's finances for the six months it was in existence in the last half of 2018, it later withdrew that report. Trinity never subsequently completed a financial audit, as required by the statute. *See id.* (d)(2)(B)(V).

37.  Aliera further misrepresented to Members that Trinity was "recognized" as a qualified HCSM. It was, in fact, impossible for Trinity to have been "recognized" as such because the rule that provided such recognition was eliminated years before Trinity was created. Trinity has never appeared on any list of recognized HCSMs developed by the U.S. Department of Health and Human Services.

38.  Unsurprisingly, the Trinity health care plans Aliera created and sold prompted increasing complaints from consumers and attracted scrutiny from state regulators:

a.    As early as April 8, 2019, the State of Washington's Office of the Insurance Commissioner issued a final investigative report concluding that Trinity was not a valid HCSM and was acting as an unauthorized insurer in Washington. The Insurance Commissioner entered a cease-and-desist order against Trinity and Aliera on May 13, 2019.

b.    On June 13, 2019, the State of Texas filed suit against Aliera alleging that it was selling unauthorized insurance products in that state and seeking to enjoin its sale of those products in Texas. *State v. Aliera Healthcare Inc.*, No. D-1-GN-19-003388 (Tex. 53d Dist. Ct.). The case has been held in abeyance since Aliera's 2021 bankruptcy.

c.    Multiple other states have followed suit, including California, Colorado, Connecticut, the District of Columbia, Iowa, Maryland, Michigan, New Hampshire, New Jersey, New Mexico, New York, Oregon, and Pennsylvania, all generally concluding that the plans were unauthorized insurance.

39.    Multiple civil lawsuits were filed against Aliera claiming the health care plans sold through Trinity were unauthorized insurance, including:

a.    *Jackson, et al., v. The Aliera Companies, Inc., et al.*, No. 2:19-cv-1281 (J. Rothstein, W.D. Wash.);

b.    *Duncan v. The Aliera Companies, Inc., et al.* No. 2:20-cv-867 (J. Nunley, E.D. Cal.);

c.    *Kelly, et al. v. The Aliera Companies, Inc, et al.*, No. 3:20-cv-05038 (J. Harpool, W.D. Mo.);

d.    *Smith, et al., v. The Aliera Companies, Inc., et al.*, No. 1:20-cv-02130 (J. Jackson, D. Colo.); and

e.    *Albina, et al. v. The Aliera Companies, Inc., et al.*, No. 5:20-cv-496 (J. Hood, E.D. Ky.).

40.    Aliera claimed in these proceedings that the Trinity HCSM plans were not insurance because neither Aliera nor Trinity had any obligation to indemnify the Members for medical claims out of their own money, and instead, all medical expenses were to be "shared" from the Members' funds. Nevertheless, it was Aliera who determined which part of the Members'

payments would be siphoned off to pay itself and which part would be placed in a fund to pay the expenses. Aliera was the claims administrator for the plans. Providers' bills were submitted to Aliera for payment, and Aliera decided whether and when claims would be paid. When Members had concerns about claims that were not paid, they called an Aliera representative.

41.     To prolong the scheme, Aliera delayed resolution of the substantive issues in the lawsuits by claiming that an arbitration clause in the back of the Trinity member guides required a multi-step dispute-resolution process culminating in binding arbitration in Georgia. Even after courts found the arbitration clauses unenforceable, Aliera appealed the decisions to further delay substantive judicial scrutiny of its illegal practices.

**III.    Aliera Restructures Itself to Mask Its Control of Trinity but Maintains Control Over Trinity and Continues to Misrepresent the Plans it Sold.**

42.     Despite the cascade of regulatory actions and lawsuits against it, Aliera continued to aggressively sell the Trinity plans and continued to pay its insurance brokers exorbitant fees to do so.

43.     In addition, Aliera reacted by attempting to superficially distance itself from Trinity while still controlling Trinity. Its protestations to courts and regulators that it was merely an administrator for Trinity, however, were misleading.

44.     After the first regulatory actions commenced, the Aliera principals hand-picked another person to become a Trinity insider. Chase, Moses, and Thead met William Guarino at an insurance legislators conference in June 2019. They recruited him to serve as Trinity's president (only its second employee) and as a third board member.

45.     Aliera created four subsidiary entities—Debtors Ensurian f/k/a Aliera Healthcare of Georgia, LLC, Advevo, Tactic Edge, and USA Benefits (collectively, the "Subsidiaries" and

each, a "Subsidiary")—and changed its name from Aliera Healthcare, Inc. to The Aliera

Companies, Inc. in 2019. Aliera divided the various tasks it was performing directly under the

2018 Agreement among these four Subsidiaries. All four Subsidiaries had their principal places of

business at 990 Hammond Drive, Atlanta, Georgia, which was also Aliera's principal place of

business.

46.     On behalf of Trinity, Thead signed five agreements with the new Aliera

Subsidiaries, all effective January 1, 2020 (the "Subsidiary Agreements"). These Subsidiary

Agreements divided the tasks delegated to Aliera in the 2018 Agreement as follows:

a.     Ensurian, which had obtained a license as an insurance agency, was granted the
exclusive right to market and sell the Trinity health care plans. Trinity granted
Ensurian the nonassignable right to purchase Trinity's membership list in the event
there was a change in the majority of the Trinity board of directors.

b.     USA Benefits was to administer all claims, prepare and send member cards and
other materials that were provided to members, provide explanations of benefits to
members and providers, maintain a process for receipt of member complaints,
handle accounting, and furnish Trinity with information it needed to prepare its
annual audit and Form 990 tax returns.

c.     Tactic Edge developed and owned the software and IT platform and maintained the
databases of member enrollment and payments. Under this agreement, it "licensed"
access to its system to Trinity.

d.     Under an "Ancillary Agreement" with Tactic Edge, that entity would handle
customer complaints and would provide coordination and communication with
regulators.

e.     Advevo was to provide marketing and brand-development services.

47.     Aliera and its Subsidiaries rebranded the Member materials, including sell sheets,

member guides, enrollment forms, member cards, web portals, and explanations of benefits, to

remove its own name and replace it with Trinity. In 2020, Trinity changed its name to Sharity,

after which the name Trinity was replaced on the materials with the name Sharity. The materials

nevertheless were all created by Aliera or one of its Subsidiaries. The administration of all Member claims and handling of Member complaints continued to be carried out by employees of Aliera or one of its Subsidiaries, even though telephone calls and emails would issue from accounts bearing a Trinity/Sharity name. Emails sent to Members under the "Trinity" or "Sharity" name were in fact sent by Aliera or one of its Subsidiaries. Newsletters sent to Members under the Trinity/Sharity name were created and sent by an Aliera Subsidiary.

48.     From the time Trinity was created until early 2021, Aliera had sole control over all payments made by members, of the costs deducted from the payments, of the amounts deposited into the Trinity account for payment of medical claims, and of the amount paid out of the Sharebox account for Members' medical expenses. Although the Members paid approximately **$363,000,000** in monthly member fees and application fees for their Trinity health care plans, Trinity never had more than three employees.

49.     A fee schedule was attached to each of these Subsidiary Agreements that allowed the Subsidiaries to be paid an amount from each Member's monthly premium payment. That amount was dependent on the amount of the member's payments; the larger the Member's monthly payment, the larger the fee paid to the Subsidiary.

50.     The Members' payments continued to go directly to Aliera or a Subsidiary, and the fees were deducted before any of the Members' payments were deposited into Trinity's Sharebox account for payment of claims. Under these contracts, the Subsidiaries paid themselves 58 to 60% of the Members' payments. In addition, brokers were still receiving exorbitant commissions on each Members' payments.

51.     By the time Sharity filed its bankruptcy petition, Aliera, with the help of the Defendant, had enrolled over 98,000 Members[4] in the Sharity health care plans. Yet, Sharity's Sharebox account remained woefully inadequate to pay Members' medical claims as they came due. As of December 3, 2021, the total amount of the gross unpaid claims was in excess of $250,000,000, but Sharity held only approximately $743,000 in its Sharebox account for payment of the Members' medical claims.

52.     Based on a board presentation, by August of 2020, Sharity showed a negative $1.2 million in net assets "with a negative net worth/assets and continuing lawsuits." Accordingly, its liabilities far exceeded its assets.

53.     Sharity itself filed a Chapter 11 case, which is being administered by the Delaware Court. Before the bankruptcy, various governmental units and private parties brought investigations, claims, and lawsuits against the Debtors and Sharity, alleging, among other things, that Sharity's health plans were unauthorized health insurance and not HCSM plans. Those cases alleged that the payments to the Debtors were in excess of amounts appropriately allowed for such services and, as such, left very little available to be used to pay Members' requests for sharing of medical expenses, i.e., Sharity's professed raison d'être. A number of courts and/or agencies issued orders against the Debtors and/or Sharity requiring them to cease and desist from offering health care sharing programs and withdraw from the health care markets in a number of states.

---

[4] There were 98,892 unique households that purchased Sharity health care plans. Many plans also had dependents in addition to the primary member enrolled in the plan such that a total of 159,307 individuals were enrolled in the plans.

**IV.    Aliera Created Trinity Knowing that It Would Fail and the Defendant Reaped the Benefits of this Fraudulent Scheme.**

54.    Aliera created the Trinity health care plans and determined the dollar amounts of monthly payments that Members would pay under each plan. It set the prices at rates that were substantially less than traditional ACA-compliant health insurance plans in order to make the plans appear attractive to purchasers, while advertising the plans as providing comparable benefits to those health-insurance plans.

55.    Aliera's goal was to continually enroll as many members as possible in order to generate as much monthly revenue as possible, and the brokers it used were encouraged to further that goal.

56.    Although the enrollment forms Aliera created asked potential Members whether they had any medical issues, upon information and belief, it had the policy of not denying membership to anyone who applied. For example, one member who enrolled in an Aliera/Trinity plan specifically informed Aliera at the time of his enrollment that he had been diagnosed with Von Willebrand Disease, a bleeding disorder. Aliera told the Member that there was a preexisting condition waiting period, but if he did not have any issues related to his condition in the past 24 months prior to sign-up, Aliera would cover him. Yet not even a year after enrolling in Aliera, the member was faced with an emergency room visit where he was admitted to the hospital. Aliera denied his claim based on his pre-existing condition, leaving him with a $79,594.94 medical bill. *See In re The Aliera Companies, Inc. f/k/a Aliera HealthCare, Inc.*, No. INS-19-0109 (Or. Tax Ct. Reg. Div. Oct. 9, 2019).

57.    At the time Sharity filed its petition for bankruptcy, Aliera or its Subsidiaries were retaining up to 60% of Members fees and were continuing to increase the commission payments

provided to the insurance brokers but were providing little value to the Members in return. Sharity also received approximately 10% of Members' payments to cover expenses, consisting primarily of defense in lawsuits and regulatory actions. As a result, only about 30% of Members' payments were actually deposited into Sharity's Sharebox account for payment of claims.

58.     Health insurers are required to pay at least 80% of premiums received toward member claims for them to comply with the ACA. 42 U.S.C. § 300gg-18(b)(1)(A). Aliera had the ratio upside down, setting aside at most 30% (and as little as 16%) of Member premiums for payment of claims.

59.     Even though the amount remaining for deposit into Sharity's Sharebox account, after payment of Aliera's and its Subsidiaries' fees and the commission payments to brokers, was woefully inadequate to pay Members' medical claims, Aliera maintained the scheme to defraud members by continuing to aggressively sell the plans to new members, thus generating larger revenue, while at the same time continuing to arbitrarily deny or delay payment of claims.

60.     At the time Sharity filed its petition for bankruptcy, Sharity Members learned for the first time from Aliera that there were claims totaling over $50 million from Members that had been approved for payment but had not yet been paid. That figure, however, revealed only a small part of the problem, because it did not include claims that had been submitted but were not yet approved or that had been arbitrarily denied. When those medical claims are added in, the total amount of the gross unpaid claims is in excess of $250,000,000. Meanwhile, at the time of Sharity's bankruptcy filing, Sharity held only approximately $743,000 in its Sharebox account for payment of the Members' medical claims.

61.    The Aliera/Sharity scheme was essentially a Ponzi scheme, with the Members acting as investors. Like all Ponzi schemes in which payments to earlier victims are paid from funds collected from newer victims, Aliera's scheme eventually failed.

62.    In most financial Ponzi schemes, the fraudulent nature of the scheme is only widely known after it collapses. Here, though, journalists, regulators, and plaintiffs' attorneys had rung the alarm bell for years, making it a matter of easily accessible public knowledge that the Aliera Insiders were running a fraudulent scheme based upon public information readily available from the work of journalists, regulators, and plaintiffs' attorneys.

63.    Sharity filed its petition for bankruptcy, and thousands of Members were left without health insurance and with huge unpaid medical bills. Many Members are now being, or have been, pursued by their health care providers for the unpaid bills.

64.    A judgment was entered against Aliera on November 11, 2021, in *Jackson, et al. v. The Aliera Companies, Inc., et al*., No. 2:19-cv-01281, in the Western District of Washington, in favor of a plaintiff class, for $20,646,077.08 in addition to other damages.  In entering the judgment, the court expressly found that Aliera had designed, marketed, and sold unauthorized and illegal health insurance, violated Washington's Consumer Protection Act, and that the plaintiffs had suffered damages as a result of illegal and fraudulent practices.

65.    Similarly, a judgment was entered against Aliera on November 17, 2021, in *Albina, et al. v. The Aliera Companies, et al.*, No. 5:20-CV-00496, in the Eastern District of Kentucky, in favor of a plaintiff class for $4,679,868.46 in addition to other damages. In entering the judgment, that court expressly found that "Aliera misled the Members into entering contracts for a product

that was not what it purported to be and did not comply with applicable federal or state law." *Id.*,
ECF No. 72 at 2.

**V.     The Essential Role of Banking Services in the Fraudulent Scheme**

66.     It would have been impossible for the Aliera Insiders to orchestrate a nationwide,
nine-figure fraud without reliable and continuous access to bank accounts and other banking
services that enabled them to receive payments from Members, make payments necessary to create
the outward appearance of a viable health care sharing ministry business, and misappropriate
sizable portions of the Members' payments for themselves. A succession of banks, including
Defendant, provided the required banking services over the course of the multi-year fraud and
Ponzi scheme.

67.     Each of the banks that provided banking services that enabled the Aliera Insiders
to establish and perpetuate the scheme also benefited significantly from the scheme and were
enriched by it because hundreds of millions of dollars of money originating from Members was
deposited into the bank accounts used to orchestrate the scheme. On information and belief, these
deposits were then put to profitable uses by the banks where they were on deposit, and the banks
would not have received these benefits had they not had use of this money on deposit that was
fraudulently obtained from the Members. In addition, Aliera and Sharity regularly paid fees to the
banks where they held accounts, as reflected on their account statements. The total amount of these
fees is yet to be determined.

**A.     Wells Fargo**

68.     In December 2016, Unity submitted an application to Wells Fargo Bank, N.A.
("Wells Fargo") for business accounts. Moses was listed as "Owner/Key Individual 1" and a "Key

Executive with Control of the Entity." This application was submitted less than two years after Moses completed his sentence for securities fraud and perjury. Wells Fargo approved the application for Unity. In addition, Wells Fargo provided accounts to Aliera directly, and these accounts were in use as early as the time the Aliera-Unity relationship began to sour in June 2018 as a result of Unity principals catching Moses embezzling Unity money from a Wells Fargo account.

69.     At the time of the application, it would not have been difficult to ascertain that Moses had been convicted of a major fraud and served a substantial sentence in federal prison. In fact, one of the Unity principals later testified during the litigation between Aliera and Unity that a simple internet search would have turned up this information.

70.     The Aliera Insiders used the accounts at Wells Fargo to run the scheme, first using Unity as the purported HCSM offering the products sold to Members and later using Trinity/Sharity as the purported HCSM, and hundreds of millions of dollars of Members' funds passed through these accounts between the initiation of the relationship with Wells Fargo and its end. It was not until November 2019 that Wells Fargo gave notice of its decision to terminate its banking relationship with Aliera and Sharity, and funds from the scheme were deposited at Wells Fargo until Spring 2020.

71.     During the period that the scheme used the accounts provided by Wells Fargo, there were numerous "red flags" that should have alerted the bank that its accounts were being used as part of a fraud:

       a.     As noted above, it would have been exceedingly easy to learn that Moses had previously run a major scam at the outset of the relationship. In addition,

Moses's criminal history was frequently highlighted in regulatory proceedings and civil litigation related to Aliera, Unity, and Trinity/Sharity.

b.    There were numerous chargebacks initiated by Members. For example, the statements for one of Aliera's Wells Fargo accounts included over 2,000 entries for "chargebacks" between 2018 and 2020.

c.    Beginning as early as May 2019, there were numerous news reports indicating that the products sold by Aliera, Unity, and Sharity were fraudulent and detailing their catastrophic impact on the lives of members who incurred substantial medical expenses they had been led to believe would be covered by the products only to have their claims delayed indefinitely or denied, often on specious grounds. *See, e.g.*, JoNel Aleccia, *"Sham" Sharing Ministries Test Faith of Patients and Insurance Regulators*, KAISER FAMILY FOUND. HEALTH NEWS (May 17, 2019), https://kffhealthnews.org/news/sham-sharing-ministries-test-faith-of-patients-and-insurance-regulators; Jenny Deam, *Buyer Beware: When Religion, Politics, Health Care and Money Collide*, HOUSTON CHRON. (July 6, 2019), https://www.houstonchronicle.com/business/article/Buyer-Beware-When-religion-politics-health-14065418.php; Reed Abelson, *It Looks Like Health Insurance, But It's Not. "Just Trust God," Buyers Are Told*, N.Y. TIMES, Jan. 2, 2020, https://www.nytimes.com/2020/01/02/health/christian-health-care-insurance.html; Reed Abelson, *New York State Investigates Christian*

*Health Cost-Sharing Affiliate*, N.Y. TIMES (Jan. 8, 2020), https://www.nytimes.com/2020/01/08/health/christian-health-insurance-subpoena.html; KMOV, *Family Thought They Bought Insurance to Cover Their Son's Birth. Then They Got a Bill for More Than $150,000*, KMOV (Feb. 26, 2020), https://www.youtube.com/watch?v=n_lN1WqYYxM; Jenna Carlesso, *"I'm Relying on Prayer." Complaints Pile Up Against Health Care Sharing Ministries as State Mounts a Defense*, CONN. MIRROR (Mar. 2, 2020), https://ctmirror.org/2020/03/02/im-relying-on-prayer-complaints-pile-up-against-health-care-sharing-ministries-as-state-mounts-a-defense; Insurance Journal, *Maryland Insurance Administration Issues Order Revoking License of Aliera Healthcare*, INS. J., Mar. 2, 2020, https://www.insurancejournal.com/news/east/2020/03/02/559863.htm.

d.      In October 2018, Unity filed counterclaims against Aliera in a lawsuit in Georgia that asserted Moses had written himself sizeable checks out of/embezzled funds from one of the business accounts at Wells Fargo.

e.      On April 8, 2019, the Washington Office of the Insurance Commissioner issued a Final Investigative Report that led to a cease-and-desist order against Trinity/Sharity on May 13, 2019. The next month, the Massachusetts Department of Insurance also issued a warning to consumers indicating that Aliera may be operating illegally in Massachusetts.

f.      On June 13, 2019, the Texas Attorney General filed a lawsuit against Aliera alleging it was selling unauthorized insurance products. *State v. Aliera*

*Healthcare Inc.*, No. D-1-GN-19-003388 (Tex. 53d Dist. Ct.). This lawsuit contained allegations that the Aliera Insiders were essentially running a Ponzi scheme when it stated that "it is difficult to see how any business model with this ratio of payment could survive unless it is sustained by a constant influx of new members."

g.   As noted above, a number of additional states followed up with their own regulatory actions against the scheme.

h.   On August 14, 2019, a class action lawsuit was filed against Aliera and Trinity/Sharity in Washington state court alleging, *inter alia*, that the purported HCSM products were in fact illegal insurance products. A similar class action was filed in Colorado on January 13, 2020, and at least four additional class actions would be filed by the end of 2020.

i.   Many of the cases filed beginning in 2019 emphasized the fact that Trinity/Sharity could not have possibly been a legitimate HCSM because it was incorporated in 2018 despite the fact that the ACA introduced a requirement that all HCSMs must have "been in existence at all times since December 31, 1999, and medical expenses of its members [must] have been shared continuously and without interruption since at least December 31, 1999." 26 U.S.C. § 5000A(d)(2)(B)(ii)(4). As a result, the conclusion that all Trinity/Sharity products were in fact illegal insurance products was unavoidable.

j.    In addition, on or about September 26, 2018, at least one account was opened at Wells Fargo in the name of Ciel Capital Group, Inc. ("Ciel Capital").   Aliera's Wells Fargo bank statements then show multiple transfers from Aliera's accounts at Wells Fargo to Ciel Capital Group, Inc. ("Ciel Capital") totaling well over $5 million. On information and belief, the Aliera Insiders used this entity to embezzle funds from the enterprise, and it was also a customer of Wells Fargo, with Steele having signed an application on its behalf for an account at Wells Fargo on September 25, 2018. A few weeks later, one of the Aliera accounts made its first transfers to Ciel Capital, totaling more than $3.6 million.

k.    There were also $1.5 million in transfers to prominent Atlanta-area criminal defense attorneys, a transfer of $10 million to an account at Merrill Lynch in August 2018, and a transfer of $1,000,000 million to the Moses Family Charitable Fund in December 2018. These transfers should have raised significant red flags that Wells Fargo should have investigated due to their size, nature, and the round numbers used for such large transfers.

72.    Despite all of these red flags, Wells Fargo did not indicate it would terminate its relationship with the scheme until November 2019, and the accounts it provided were not actually closed until at least April 2020.

73.    During the time Aliera and Trinity/Sharity banked with Wells Fargo, Wells Fargo charged them with various fees for its services.

74.     Wells Fargo also tried to market additional services to Aliera, including cash management services in August 2018.

75.     As noted above, the Texas Attorney General, joined by other law enforcement and regulators, concluded the scheme was effectively a health care Ponzi scheme. In fact, the massive fraud orchestrated by the Insiders with the assistance of Wells Fargo differs from traditional financial Ponzi schemes in a way that raises even more concerns in a manner not at all favorable to Aliera's banks. While financial Ponzi schemes are typically characterized by few public accusations that the business is in fact a Ponzi scheme before they are exposed and collapse, in this case there were years of public accusations—backed by substantial evidence that was publicly available beginning at least as early as the time of Unity's counterclaims in 2018 and buttressed by numerous complaints and reports filed by the middle of 2019—that the Insiders were using Aliera, Unity, and Trinity/Sharity to run a massive fraud. Nonetheless, Wells Fargo and subsequent banks discussed below provided banking services that were essential to the fraud until it finally collapsed after Trinity/Sharity's bankruptcy filing in July 2021.

**B.     BMO**

76.     BMO provided banking services to Aliera and Trinity/Sharity starting in February 2020, with accounts active beginning as early as March 2020. Just one of the scheme's accounts at BMO received well over $20 million in deposits in the less than six months that the BMO accounts were open.

77.     By the time BMO agreed to provide banking services, Aliera and Trinity/Sharity's banking relationship with Wells Fargo had already been terminated by Wells Fargo.

78.    On March 30, 2020, once accounts for Aliera were already active, a Director of Commercial Banking at BMO contacted Aliera and requested a response to articles that were identified through the bank's "adverse media searches." Among other things, a response from an attorney for Aliera discussed regulatory investigations and actions against Aliera by insurance regulators in multiple states. Notably, BMO did not perform the media searches that led to this information until more than a month after it had already decided to provide banking services to Aliera.

79.    More than six weeks later, on May 18, 2020, BMO sent a letter to Steele at Aliera that began by stating: "As required by law, BMO Harris Bank N.A. ('BMO Harris') conducts regular relationship reviews to ensure that account activity conducted complies with federal regulations and does not exceed the risk tolerance of the bank." Then, it informed her that "after careful consideration, BMO Harris has determined the above deposit account(s) and all related services will be closed by the end of business on August 31, 2020."

80.    While BMO initially gave June 30, 2020, as the date when the Aliera accounts at its bank would be closed, it ultimately extended this deadline until August 31, 2020, at the request of Aliera and Steele, providing an additional accommodation to Aliera in order to enable it enough time to find another bank willing to service Aliera. By providing nearly five months of banking services after it became aware of credible evidence that the Aliera Insiders were running a fraud, BMO helped enable the Aliera Insiders to continue the fraud for more than another year until Sharity's bankruptcy.

81.    During the time Aliera and Trinity/Sharity banked with BMO, it charged them various fees for its services.

### C.   **Merrill Lynch and Bank of America**

82.     Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"), a subsidiary of Bank of America, N.A. ("Bank of America"), provided banking services to Aliera and its subsidiaries beginning in March 2020 until at least the end of July 2020, and some of these accounts were still open as late as July 2021. On information and belief, it also provided cash management services as early as August 2018.

83.     In January 2020, Aliera provided information to Bank of America concerning legal issues facing Aliera and Trinity/Sharity, including a cease-and-desist order from the Colorado Division of Insurance from earlier that month. This sort of red flag should have resulted in significant follow-up activity from Merrill Lynch and/or Bank of America.

84.     By the time Merrill Lynch opened accounts for the Aliera entities in March 2020, Wells Fargo had already terminated Aliera as a customer.

85.     The accounts at Merrill Lynch were "working capital management accounts," which were not the typical types of bank accounts a business would use for its operations. The statements for these accounts were the types of statements that would be provided for investment-management accounts. For example, each statement provided a section summarizing and providing a pie chart concerning the "Asset Allocation."

86.     Despite the fact that its account was essentially an investment account, one of the Aliera subsidiaries received over $35 million in deposits and was used to operate important aspects of the scheme. For instance, this account was used to make numerous payments to vendors. Another account in the name of Aliera received more than $6 million in deposits and made a large number of payments to medical providers.

87.     The fact that these nontraditional types of accounts with tens of millions of dollars in deposits were clearly being used to operate a business should have raised red flags that would have led Merrill Lynch to do additional research into the business the Aliera Insiders were using its bank to run. Even a cursory investigation such as an internet search would have turned up a significant amount of discussion of the legal issues facing Aliera and the Insiders, including considerable evidence indicating the business was in fact a massive fraud.

88.     Long before the Aliera Insiders began running the scheme using the Merrill Lynch accounts, a Vice President and Wealth Management Advisor was attempting to pitch the Insiders on Merrill Lynch's investment-banking services. For example, in May 2019, he wrote Tim Moses and stated: "I wanted to set something up for you to meet the Investment Banking team for the SE as well as the Healthcare banking specialist – they sit in Atlanta and can come to you." On May 28, 2019, he and Aliera employees emailed each other about setting up a future meeting with Moses. By this time, there was already public discussion of Aliera being a fraud and an illegal insurance business, including from Washington state and news reports. As part of its research into Moses and Aliera as potential clients, Merrill Lynch should have turned up such red flags, and following up on them would have easily led to finding documents raising serious issues about Moses and Aliera's business. In July 2019, after additional regulatory complaints had been filed against Aliera, this same banker wrote Chase about potentially reviewing his home mortgage, invited Moses and Chase to play golf, and indicated that he expected to see Chase in August 2019.

89.     Further demonstrating the closeness of the relationship between Merrill Lynch and the Aliera Insiders and Merrill Lynch's knowledge of the legal dispute between Aliera and Unity (which included accusations that Moses embezzled Member funds), in March 2019, this same

banker from Merrill Lynch had also forwarded an email to Aliera he had received from Kingdom Healthshare (the name Unity was going by at that time after its split from Aliera) that included information on the products it was offering. An email chain between the banker, Steele, and Chase ensued, focused on how this business was not supposed to be using the Kingdom name. The Merrill Lynch banker wrote "Unbelievable!!!" in one email and "Glad we have proof!!! The rep actually left me a voicemail?!? I saved it in case you'll need it" in another email to Steele and Chase. Emails from January 2020 show this banker was involved in setting up the banking relationship between Aliera and Merrill Lynch at that time.

90.     In addition, a transfer of $10 million was made from an Aliera operating account at Wells Fargo to an account at Merrill Lynch in August 2018.

91.     The banking services Merrill Lynch provided were essential to orchestrating and continuing the fraudulent scheme until the Aliera Insiders moved to their next banking relationship.

92.     During the time Aliera and/or Trinity/Sharity banked with Merrill Lynch, it charged them various fees for its services.

## VI.    Aliera and Trinity/Sharity's Insolvency

93.     Aliera was insolvent since its inception.

94.     The Debtors were insolvent because, without limitation, the value of their liabilities exceeded the value of their assets and the Debtors did not have adequate capital.

95.     As of December 31, 2017, Aliera had assets valued at $16,348,278 and liabilities of $15,730,947 according to its 2017 audit.

96.    As of December 31, 2018, Aliera had assets valued at $65,369,378 and liabilities of $57,287,961 according to its 2018 audit.

97.    However, the liabilities reflected in these audits did not include liabilities owing to Sharity and the Members as a result of the fraudulently obtained funds, which amounts far exceeded any stockholders' equity.

98.    As examples of these additional liabilities, the *Jackson* class (W.D. Wash.) received a judgment against Aliera in the amount of $20,646,077.08, which reflected liabilities not included in the 2017 or 2018 audit.

99.    Additionally, the *Albina* class (E.D. Ky.) received a judgment against Aliera in the amount of $4,679,868.46, which reflected liabilities not included in the 2017 or 2018 audit.

100.    Taking these, and additional liabilities (including, without limitation, those resulting from claims of Members) not accounted for in any of Aliera's audits, it is clear that Aliera's liabilities far exceeded the value of its assets at a fair valuation.

101.    All of Aliera's assets were obtained using funds derived from Unity, Sharity, and the Members on a fraudulent basis, thereby creating a claim against Aliera for each dollar it received. Accordingly, its liabilities far exceeded its assets.

102.    Trinity/Sharity was also insolvent since its inception.

103.    In addition to any liabilities that appeared on any of its audits or in its initial bankruptcy filings, the liabilities reflected in these audits and filings did not include liabilities owing to the Members as a result of the fraudulently obtained funds, which amounts far exceeded any stockholders' equity in Trinity/Sharity. As a result, it is clear that Trinity/Sharity's liabilities far exceeded the value of its assets at a fair valuation.

## CLAIMS FOR RELIEF

104.    The following causes of action are asserted against the Defendant without prejudice to any rights the Plaintiffs or the Debtors may have against the Defendant and any third parties, or which this Court may grant to the Plaintiffs or the Debtors, to assert additional causes of action or allegations based on facts disclosed in documents or other information made available to the Plaintiffs or the Debtors or developed as a result of discovery or otherwise.

105.    All conditions precedent to the maintenance of this action, the filing of this Complaint, and to the following claims have been performed, been waived, satisfied, have occurred, or have otherwise been met.

## COUNT I:
## VOIDABLE TRANSFERS AND OBLIGATIONS – CONSTRUCTIVE FRAUD
(11 U.S.C. § 544(b) and O.C.G.A. § 18-2-75(a))
(The Aliera Trustee against the Defendant)

106.    Plaintiffs restate and incorporate herein by reference the allegations contained in all paragraphs above.

107.    Pursuant to 11 U.S.C. § 544, the Aliera Trustee brings this claim on behalf of the Debtors' estates and their creditors under the Georgia Uniform Voidable Transfer Act, O.C.G.A. §§ 18-2-75, *et seq.*,[5] as they are entitled to do under O.C.G.A. § 18-2-20 and O.C.G.A. § 18-2-21.

108.    Aliera has one or more creditors for whom the Aliera Trustee can act whose claim arose before or within a reasonable time after the obligation was incurred, including the Members.

---

[5] Pursuant to O.C.G.A. § 18-2-80(b), "a cause of action in the nature of a claim for relief under [the Uniform Voidable Transactions Act] is governed by the law of the jurisdiction in which the debtor is located when the transfer is made or the obligation is incurred. The Debtors' chief executive office and principal place of business was located at 990 Hammond Drive, Atlanta, Georgia, and thus the Debtors were located in Georgia when the obligations for each of the transfers was incurred pursuant to O.C.G.A. § 18-2-80(a). Accordingly, the causes of action regarding all avoidable transfers are governed under both Bankruptcy and Georgia law.

109.    Under O.C.G.A. § 18-2-75, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

110.    Aliera was insolvent throughout its relationship with Defendant.

111.    Aliera made transfers or incurred obligations, without limitation, in the form of deposits, service charges, and account fees for the benefit of the Defendant (the "Transfers").

112.    Aliera (a) received less than a reasonably equivalent value in exchange for the Transfers, and (b) was (i) insolvent on the date of each transfer and obligation, or became insolvent as a result of each transfers or obligations; (ii) engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Aliera was an unreasonably small capital; or (iii) intended to incur, or believed that the Debtors would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

113.    Further, because Defendant's services to the company, in whatever form, were premised on maintenance and perpetuation of a fraudulent scheme, it did not contribute value in exchange for the Transfers.

114.    Aliera made the Transfers within four (4) years of the Petition Date.

115.    The Transfers constitute transfers of interests of Aliera in property.

116.    At the time the Transfers were made, there existed one or more actual and/or future creditors of Aliera holding unsecured claims allowable within the meaning of Bankruptcy Code sections 502 and 544(b).

**COUNT II:**
**VOIDABLE TRANSFERS AND OBLIGATIONS – ACTUAL FRAUD**
(11 U.S.C. § 544(b) and O.C.G.A. § 18-2-74(a)(1))
(The Aliera Trustee against the Defendant)

117.    The Plaintiffs restate and incorporate herein by reference the allegations contained

in all paragraphs above.

118.    Pursuant to 11 U.S.C. § 544, the Aliera Trustee brings this claim on behalf of the

Debtors' estates and their creditors under O.C.G.A. §§ 18-2-74, *et seq.*, as they are entitled to do

under O.C.G.A. § 18-2-20 and O.C.G.A. § 18-2-21.

119.    Aliera was insolvent throughout its relationship with Defendant.

120.    Aliera made transfers or incurred obligations, without limitation, in the form of

deposits, service charges, and account fees for the benefit of the Defendant (the "Transfers").

121.    The Transfers were made with the actual intent to hinder, delay, or defraud entities

to which Aliera were obligated to, or became obligated, on or after the date of such transfers.

122.    The Transfers constitute transfers of interests of Aliera in property.

123.    The Transfers were made within four years (4) before the Petition Date.

124.    At or around the time that Aliera made the Transfers, the Debtors were being sued

or threatened with suits, including but not limited to the cease-and-desist complaints in multiple

states and class action litigation.

125.    The Transfers were made to or for the benefit of the Defendant in furtherance of a

fraudulent scheme.

126.    Aliera did not receive reasonably equivalent value in exchange for the Transfers.

127.    Aliera was insolvent as a result of and prior to the Transfers.

128.    Defendant acted in bad faith by accepting the fraudulent Transfers.

129.    These fraudulent Transfers give rise to a cause of action in equity to avoid the Transfers, and a cause of action at law for damages from the fraud.

130.    Accordingly, the Aliera Trustee is entitled to a judgment under O.C.G.A. §§ 18-2-74(a)(1) and 18-2-77(a), avoiding the transfers and the obligations.

131.    The Aliera Trustee is also entitled, pursuant to O.C.G.A. § 18-2-21, to a judgment granting both general and punitive damages for the tortious injury Plaintiffs received from Defendant's participation in the fraudulent Transfers.

132.    Defendant's conduct warrants an award of punitive damages. Defendant's actions evinced fraud as set forth herein. Despite knowing about Aliera's illicit, fraudulent business, Defendant took affirmative steps to do business with Aliera and/or failed to deny or reject Aliera as a customer or client. Because Defendant knew or should have known about the harms Aliera perpetrated on the Members, Defendant's conduct materially contributed to those harms and amounts to a specific intent to cause or facilitate those harms.

133.    At the time the Transfers were made, there existed one or more actual and/or future creditors of Aliera holding unsecured claims allowable within the meaning of Bankruptcy Code section 502 and 544(b).

**COUNT III:**
**VOIDABLE TRANSFERS AND OBLIGATIONS AS TO PRESENT OR**
**FUTURE CREDITORS**
(11 U.S.C. § 544(b) and O.C.G.A. § 18-2-74(a)(2))
(The Aliera Trustee against the Defendant)

134.    The Plaintiffs restate and incorporate herein by reference the allegations contained in all paragraphs above.

135.     Pursuant to 11 U.S.C. § 544, the Aliera Trustee brings this claim on behalf of the Debtors' estates and their creditors under O.C.G.A. §§ 18-2-74, *et seq.,* as they are entitled to do under O.C.G.A. § 18-2-20 and O.C.G.A. § 18-2-21.

136.     Aliera was insolvent throughout its relationship with Defendant.

137.     Aliera made transfers or incurred obligations, without limitation, in the form of deposits, service charges, and account fees for the benefit of the Defendant (the "Transfers").

138.     The Transfers constitute transfers of interests of Aliera in property.

139.     At or around the time at which the Transfers were made, and the obligations were incurred, Aliera was engaged or was about to be engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

140.     At or around the time at which the Transfers were made, Aliera intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

141.     The Aliera Trustee is entitled to a judgment under O.C.G.A. §§ 18-2-74(a)(2) and 18-2-77(a), avoiding the Transfers.

142.     At the time the Transfers were made, there existed one or more actual and/or future creditors of Aliera holding unsecured claims allowable within the meaning of Bankruptcy Code section 502 and 544(b).

**COUNT IV:**
**RECOVERY OF TRANSFERS**
(11 U.S.C. § 550)
(The Aliera Trustee against the Defendant)

143.     The Plaintiffs restate and incorporate herein by reference the allegations contained in all paragraphs above.

144.     Aliera made transfers or incurred obligations, without limitation, in the form of deposits, service charges, and account fees for the benefit of the Defendant (the "Transfers").

145.     Pursuant to § 550 of the Bankruptcy Code, in a fraudulent transfer action commenced under §§ 544 and 548 of the Bankruptcy Code, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.

146.     The Transfers are avoidable pursuant to Sections 544 and 548 of the Bankruptcy Code.

147.     Pursuant to 11 U.S.C. § 544, the Aliera Trustee brings this claim on behalf of the Debtors' estates and their creditors under O.C.G.A. §§ 18-2-74, *et seq.*

148.     The Transfers were made to or for the benefit of the Defendant in furtherance of a fraudulent scheme.

149.     The Defendant was the initial transferee of the Transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Transfers were made.

150.     The Aliera Trustee is entitled to a judgment against the Defendant in an amount of the Transfers pursuant to 11 U.S.C. § 550, for the respective amounts transferred, plus interest thereon at the legal rate from the date of the filing of this Complaint.

### COUNT V:
### PRESERVATION OF AVOIDED TRANSFERS
(11 U.S.C. § 551)
(The Aliera Trustee against the Defendant)

151.    The Plaintiffs restate and incorporate herein by reference the allegations contained in all paragraphs above.

152.    Aliera made transfers or incurred obligations, without limitation, in the form of deposits, service charges, and account fees for the benefit of the Defendant (the "Transfers").

153.    Pursuant to § 551 of the Bankruptcy Code, any transfer avoided is preserved for the benefit of the Estates, but only with respect to property of the Estates.

154.    As a result of the foregoing, the Aliera Trustee is entitled to a judgment pursuant to sections 544, 548, 550(a) and 551 of the Bankruptcy Code (a) avoiding and preserving each of the Transfers to the Defendant and (b) directing that those Transfers be set aside.[6]

### COUNT VI:
### FRAUD
(O.C.G.A. § 51-6-1)
(Both Trustees against the Defendant)

155.    The Plaintiffs restate and incorporate herein by reference the allegations contained in all paragraphs above.

156.    Pursuant to O.C.G.A. § 51-6-1, "[f]raud, accompanied by damage to the party defrauded, always gives a right of action to the injured party."

---

[6] With respect to Counts I–V, should additional transfers, transferees, obligations, or obligees be discovered, the Plaintiffs reserve the right to seek leave of Court to amend the Complaint and name such transferees or obligees as defendants in this action.

157.    Pursuant to O.C.G.A. § 51-6-4, "fraud may be committed by acts as well as words." It includes any deceit, artifice, trick, or design involving active operation of the mind used to circumvent and cheat another.

158.    Defendant conspired with Debtors' agents with respect to their tortious conduct. Defendant thus committed a fraud against Debtors and their members. The trustees are therefore entitled to recover damages as a result of Defendant's fraud.

159.    Each transaction sought to be avoided under the United States Bankruptcy Code and Georgia law, as set out in Counts I–V herein, constituted a fraudulent conveyance which is subject to recovery both in equity and at law.

160.    The fraudulent conduct also included operation of a false HCSM that caused the Members' payments to be paid to the Debtors utilizing Defendant's bank; marketing and representing Trinity health care plans as HCSM plans, even though Debtors knew that Trinity could not qualify as a legitimate HCSM; misrepresenting to Members that "up to 40% of your member contribution goes towards the administration of this plan and other general overhead costs to successfully carry out the duties of administering these services;" transferring some or all of those funds to the Insiders and the Defendant; and rendering Sharity insolvent and unable to pay the members' medical expenses and resulting in Aliera's arm's length creditors not receiving payment on their claims

161.    Accordingly, the Trustees are entitled to a judgment against the Defendant for actual damages in an amount to be proven at trial, plus punitive or exemplary damages.

## COUNT VII:
## CONSPIRACY TO COMMIT FRAUD
(Both Trustees against the Defendant)

162.    The Plaintiffs restate and incorporate herein by reference the allegations contained in all paragraphs above.

163.    Defendant combined with Debtor to accomplish unlawful ends, including fraud.

164.    Debtors were perpetrating a massive fraud and were utilizing the services of Defendant to perpetuate the fraud, including but not limited to providing banking and financial services to Debtors, receiving funds from Debtors, and distributing those funds to persons not entitled to receive them.

165.    Upon information and belief, Defendant had actual knowledge of the fraud. Defendant knew that Debtors were perpetrating a fraud or engaging in other wrongful acts through Defendant's bank based upon, among other things, operating a false HCSM that caused the Members' payments to be paid to Debtors; transferring some of or all of those funds to the Insiders; and rendering Sharity insolvent and unable to pay the members' medical expenses and resulting in Aliera's arm's length creditors not receiving payment on their claims

166.    Debtors' business constituted a Ponzi scheme. By effectuating millions of dollars in transactions through the Debtors' accounts, Defendant provided substantial assistance to Debtors' Ponzi scheme.

167.    As a result of the continuing fraud, Members continued to make monthly payments to Debtors which perpetuated the Ponzi scheme until each of the Debtors entered into bankruptcy proceedings.

168.    Without the substantial assistance that Defendant provided, the members would not have been subject to continued participation in the fraudulent activity that amounted to a Ponzi scheme.

169.    Because Defendant conspired with Debtor in its fraud, the actionable deeds of Debtor are chargeable to Defendant.

170.    Accordingly, the Trustees are entitled to a judgment against the Defendant for its conspiracy to commit fraud, and damages in an amount to be proven at trial.

## COUNT VIII:
## NEGLIGENCE AND GROSS NEGLIGENCE
(Both Trustees against the Defendant)

171.    The Plaintiffs restate and incorporate herein by reference the allegations contained in all paragraphs above.

172.    A fiduciary relationship existed between Aliera's Board of Directors and Aliera. Aliera's Board of Directors owed fiduciary duties of due care, good faith, and loyalty to Aliera.

173.    A fiduciary relationship existed between Sharity's Board of Directors and Sharity. Sharity's Board of Directors owed fiduciary duties of due care, good faith, and loyalty to Sharity.

174.    Additionally, because the transactions at issue occurred while Debtors were insolvent or in the zone of insolvency, Debtors' directors and officers each owed fiduciary duties of due care, good faith, and loyalty to Debtors' creditors.

175.    Debtors' directors and officers breached their fiduciary duties to Debtors through, among other things, operating a false HCSM that caused the Members' payments to be paid to the Debtors; marketing and representing Trinity health care plans as HCSM plans, even though it knew that Trinity could not qualify as a legitimate HCSM; misrepresenting to Members that "up to 40%

of your member contribution goes towards the administration of this plan and other general overhead costs to successfully carry out the duties of administering these services;" transferring some or all of those funds to the Insiders and the Defendant; and rendering Sharity insolvent and unable to pay the members' medical expenses and resulting in Aliera's arm's length creditors not receiving payment on their claims.

176.    The Defendant was aware, or through the exercise of due diligence should have known, that Debtor's directors and officers owed fiduciary duties. It also knew, or through the exercise of due diligence should have known, that the actions of Debtors' directors and officers as described above constituted a breach of their fiduciary duties.

177.    The Defendant owed a duty of care to Debtors, which were the Defendant's customers. The Defendant was required to conform to a certain standard of conduct to protect Debtors against the unreasonable risks that Debtors' directors and officers imposed upon them.

178.    The Defendant failed to conform to that standard. Rather than reject Aliera and Sharity as a customer, despite ample information, public or otherwise reasonably ascertainable, concerning the illicit conduct that Debtors' directors and officers caused Debtors to carry out, the Defendant welcomed the opportunity to do business with Debtors. The Defendant thereby breached the duty of care it owed to Aliera and Sharity as its customers.

179.    The Defendant's conduct caused Debtors injury by facilitating the directors and officers' breach of their fiduciary duty to Debtors. Debtors' directors and officers required a bank to carry out their scheme.

180.    Debtors were actually damaged and sustained actual losses from the Defendant's breach of its duty of care. Among other things, Debtors were not able to pay arm's length creditors' claims.

181.    The breach of the duty of care described in this count also constitutes gross negligence under Georgia law, including Ga. Code § 51-1-4, because it evidences a lack of even slight diligence by the Defendant, and therefore warrants the imposition of punitive or exemplary damages.

182.    Accordingly, the Trustees are entitled to a judgment against the Defendant for damages in an amount to be proven at trial.

## COUNT IX:
## UNJUST ENRICHMENT
(Both Trustees against the Defendant)

183.    The Plaintiffs restate and incorporate herein by reference the allegations contained in all paragraphs above.

184.    In the alternative, to the extent that there was no contractual relationship between Debtors and Defendant with respect to claims set forth herein, Plaintiffs assert a claim for unjust enrichment.

185.    The banking relationship between Defendant and Debtors conferred a financial benefit on the Defendant through (1) the payment of fees by Debtors to Defendant and (2) the net interest income earned by Defendant as a result of the deposit by Debtors of millions of dollars of Debtors funds that were derived from member payments.

186.    Defendant accepted the benefit conferred by Debtors without compensating Debtor and its members by providing commensurate value in return.

187.    Because the entire enterprise operated by Debtors was a Ponzi scheme and otherwise arose from the sale of illegal insurance, all funds that Defendant received from Debtor amounted to an improper windfall to Defendant.

188.    It would be unjust to allow Defendant to retain the benefit conferred upon it without compensating the Debtors in return.

189.    Accordingly, the Trustees are entitled to a judgment against the Defendant for unjust enrichment in an amount to be determined at trial.

### COUNT X:
### CIVIL CONSPIRACY
(Both Trustees against the Defendant)

190.    Plaintiffs restate and incorporate herein by reference the allegations contained in all paragraphs above.

191.    Defendant, acting in concert with the directors and officers of Aliera, and/or the directors and officers of Sharity, and/or other third parties, engaged in various forms of wrongful and tortious conduct, including, without limitation, converting Debtors' funds for their own use and benefit through acceptance of fees and net interest income during the time that both Aliera and Sharity were insolvent, as well as (1) participating in Debtors' fraudulent transfer scheme as set forth in Court I; (2) participating in Debtors' actual fraudulent transfer scheme as set forth in Count II; (3) participating in Debtors' fraudulent transfer scheme as set forth in Count III; (4) participating in Debtors' fraud scheme as set forth in Count VI; and (5) committing fraud as set forth in Count VII, including aiding and abetting breaches of the fiduciary duty Aliera's directors and officers owed to Aliera and/or Sharity.

192.    Aliera's directors and officers owed fiduciary duties of due care, good faith, and loyalty to Aliera. Sharity's directors and officers owed fiduciary duties of due care, good faith, and loyalty to Sharity. Additionally, because the transactions at issue occurred while Aliera and Sharity were each insolvent or in the zone of insolvency, the directors and officers of each owed fiduciary duties of due care, good faith, and loyalty to Aliera and its creditors and/or Sharity and its creditors.

193.    Defendant conspired with Aliera's and/or Sharity's directors and officers, and/or other third parties, to commit the tortious acts set forth herein, and the directors and officers, and/or other third parties, actually did commit the tortious acts as set forth herein in furtherance of this conspiracy by, without limitation, allowing Aliera, a for-profit, non-HCSM company, and Sharity, a non-qualifying purported HCSM company, to conduct a Ponzi scheme and, without limitation, market the HCSM and to retain over 80% of the payments the Members paid to Sharity for their personal benefit.

194.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise Aliera's and/or Sharity's directors and officers' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the company's operations and financial condition in order to retain as many proceeds as possible for the Insiders and the Defendant's personal benefit and pecuniary gain.

195.    Without limitation of the foregoing fraudulent transfers under the Georgia Fraudulent Transfer Act, including those set out in Counts I–V herein, constitute a tort upon which a conspiracy claim may be based.

196.     Without limitation of the foregoing, negligence, gross negligence, and unjust enrichment, as set out in Counts VIII–IX herein, constitute a tort upon which a conspiracy claim may be based. Defendant's tortious conduct caused loss and damage to Aliera, Sharity, their creditors, and the Members.

197.     Accordingly, the Aliera Trustee and the Sharity Trustee are each entitled to a judgment against the Defendant for its conspiracy and damages in an amount to be proven at trial and for punitive or exemplary damages.

## COUNT XI:
## PUNITIVE DAMAGES
(Both Trustees against the Defendant)

198.     The Plaintiffs restate and incorporate herein by reference the allegations contained in all paragraphs above.

199.     Defendant's gross negligence and fraudulent conduct described herein warrants imposition of punitive or exemplary damages.

200.     Defendant's actions have shown willful misconduct, malice, wantonness, oppression, and that entire want of care which would raise the presumption of conscious indifference to consequences.

201.     Plaintiffs are therefore entitled to an award of punitive damages against Defendant in such amount as deemed reasonable and just by the trier of fact.

## COUNT XII:
## ATTORNEYS' FEES AND COSTS
(Both Trustees against the Defendant)

202.     Plaintiffs restate and incorporate herein by reference the allegations contained in all paragraphs above.

203.    To the extent Plaintiffs prove at trial that they are entitled to punitive damages under Georgia law for any of the claims herein, then they are entitled to recover from Defendant their reasonable attorneys' fees and costs incurred in pursuing this action.

204.    Defendant has also acted in bad faith, been stubbornly litigious, and caused Plaintiffs unnecessary trouble and expense. Plaintiffs are entitled to an award of damages, including reasonable attorneys' fee and expenses incurred in bringing this action.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs respectfully request that this Court grant judgment as follows:

(a**)**    Enter judgment against Defendant for all actual and punitive damages;

(b)    Declare the Transfers and the Obligations to be avoided, and award judgment against the Defendant in the amounts to be determined at trial based upon the Counts set forth above;

(c)    Award pre-judgment and post-judgment interest;

(d)     Award Plaintiffs their reasonable attorneys' fees and costs as allowed under Georgia law;

(e)    Pursuant to 11 U.S.C. § 502(d), disallow, any claim of Defendant against the Debtors; and

(f)     Grant such other and further relief to Plaintiffs as may be just and proper.

Dated:  December 21, 2023                        Respectfully submitted,
Atlanta, Georgia

Leon S. Jones (Ga. Bar No. 003980)
JONES & WALDEN LLC
699 Piedmont Avenue NE
Atlanta, GA 30308
(404) 564-9300
ljones@joneswalden.com

James J. Varellas III (Ky. Bar No. 93601)*
VARELLAS & VARELLAS PLLC
360 East Vine Street, Suite 320
Lexington, KY 40507
(859) 252-4473
jayvarellas@varellaslaw.com

Jerome P. Prather (Ky. Bar No. 91397)*
GARMER & PRATHER, PLLC
141 North Broadway
Lexington, KY 40507
(859) 254-9351
jprather@garmerprather.com

William H. Anderson (Colo. Bar. No. 45960)*
HANDLEY FARAH & ANDERSON PLLC
5353 Manhattan Circle, Suite 204
Boulder, CO 80303
(303) 800-9109
wanderson@hfajustice.com

Simon Wiener (Mass. Bar No. 711949)*
HANDLEY FARAH & ANDERSON PLLC
68 Harrison Avenue, Suite 604
Boston, MA 02111
(202) 921-4567
swiener@hfajustice.com

*Counsel for Plaintiffs*

*\*Pro hac vice application forthcoming*